**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| R. ALEXANDER ACOSTA, *Secretary of Labor, United States Department of Labor* | CIVIL ACTION |
|---|---|
| v. | NO. 17-1018 |
| OSAKA JAPAN RESTAURANT, INC., J.H.S.K., INC., KWANG BUM KIM and JAMES KIM | |

**MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT**

Baylson, J.                                                    July ___12___ , 2018

**I.      Introduction**

Plaintiff R. Alexander Acosta, Secretary of Labor, United States Department of Labor moves for partial summary judgment in this action asserting violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* against Defendants Osaka Japan Restaurant, Inc. and J.H.S.K, Inc., sushi restaurants in Philadelphia, Pennsylvania and Lansdale, Pennsylvania, respectively; Kwang Bum Kim, the owner of both restaurants; and his son, James Kim, manager of the Lansdale location.

The Complaint asserted numerous ways in which Defendants violated the FLSA:

1)   Violation of the Minimum Wage Requirement for Tipped Employees;

2)   Failure to Pay Overtime; and

3)   Failure to Keep Records.[1]

Plaintiff further asserts that Defendants' violations of the FLSA were willful, and seek back wages, liquidated damages, and an injunction against Defendants, as well as to hold both Kwang Bum and James Kim individually liable.  (Pl.'s Mot. for Summ. J. ECF 29.)

---

[1] Plaintiff does not separate these alleged FLSA violations into separate counts in its Complaint. (See Compl., ECF 1.)

For the reasons that follow, Plaintiff's motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART.**

## II.     Background

### A. The Defendants

Defendant Osaka Japan Restaurant ("Osaka Chestnut Hill") is a fusion/sushi restaurant located at 8605 Germantown Avenue in Philadelphia, which has been in operation for approximately thirteen years.  (Pl.'s SOF ¶¶ 1-4; Defs.' SOF ¶¶ 1-4).  Osaka Chestnut Hill serves dinner seven days a week and lunch Monday-Saturday; on days when both lunch and dinner are served, the restaurant closes between 2:30 and 5:00 PM.  (Pl.'s SOF ¶ 4; Defs.' SOF ¶ 4).

Defendant J.H.S.K Inc. ("Osaka Lansdale") is a fusion/sushi restaurant located at 1598 Sumneytown Pike in Lansdale, Pennsylvania, which has been in operation for approximately eight years.  (Pl.'s SOF ¶¶ 5-8; Defs.' SOF ¶¶ 5-8).  Osaka Lansdale serves dinner seven days a week and lunch Monday-Friday; on days when both lunch and dinner are served, the restaurant closes between 2:30 and 5:00 PM.  (Pl.'s SOF ¶ 8; Defs.' SOF ¶ 8).

Defendant Kwang Bum Kim is the president, sole corporate officer, and owner of Defendants Osaka Japan Restaurant and J.H.S.K Inc.  (Pl.'s SOF ¶ 9; Defs.' SOF ¶ 9).  Kwang Bum Kim previously owned and operated an Osaka restaurant in Wayne, Pennsylvania ("Osaka Wayne"), which he opened approximately 18 years ago and closed approximately 15 years ago.  (Pl.'s SOF ¶ 11; Defs.' SOF ¶ 11).  He testified at his deposition, through a translator, that he "do[es] not understand English."  (KBK Dep. 137:1, Ex. A to Pl.'s Mot. for Summ. J., ECF 29-5).

Defendant James Kim, the son of Kwang Bum Kim, was the manager of Osaka Lansdale, a position he held, with an interruption to sell life insurance in approximately 2012, from 2010 to

2016. (Pl.'s SOF ¶ 13-14; Defs.' SOF ¶ 13-14). In 2001 or 2002 to 2003, he worked as a server at Osaka Wayne. (James Kim (JK) Dep. 216:19-24), Ex. B to Mot. for Summ. J., ECF 29-6).

The parties dispute the scope of James's responsibilities and autonomy as manager of Osaka Lansdale. Whereas Plaintiff asserts that James was responsible for "interviewing employees, firing employees, hiring employees, and recommending prospective employees" to his father and enforcing workplace rules, such as not sitting down during service, Defendants point to deposition testimony from both Kwang and James that Kwang, not James, hired employees and that James only "relay[ed] the messages to fire employees," could not set pay rates, and merely passed on his father's rules. (Pl.'s SOF ¶ 15; Defs.' SOF ¶ 15). James testified that Kwang James testified that he "was instructed to put together payroll once a week" at Osaka Lansdale, which involved "doing the balance books or the tip sheets." (JK Dep. 24:10-11). Kwang testified that his son had "no power." (JK Dep. 138:14).

Kwang, to whom James referred to throughout his deposition as "Mr. Kim," fired James as manager of Osaka Lansdale in October 2016. (JK Dep. 11:1-9).

### B. Types of employees at Osaka

Osaka employed servers, hosts, bussers, bartenders, dishwashers, kitchen chefs, sushi chefs, and, at Osaka Lansdale, hibachi chefs.[2] (Pl.'s SOF ¶ 33, 39; Defs.' SOF ¶ 33, 39). Most types of employees were paid an hourly wage, and the kitchen chefs, sushi chefs, and hibachi chefs were paid a daily rate set by Kwang. (Pl.'s SOF ¶ 33, 38-39; Defs.' SOF ¶ 33, 38-39).

---

[2] In their response to Plaintiff's statement of undisputed facts, Defendants repeatedly dispute that James "employed" any of the individuals at Osaka—and raise this objection to any use of the term "Defendants"—but these facts are otherwise presented in the light most favorable to Defendants.

Bartenders and some servers were paid $2.83 per hour, and bussers were paid $5.00 per hour.[3] (Pl.'s SOF ¶ 34-35; Defs.' SOF ¶ 34-35). Daily-rate employees were paid $80-160 per day. (Pl.'s SOF ¶ 40; Defs.' SOF ¶ 40).

All Osaka employees clock in and out on a point-of-sale computer system known as Micros, which records hours worked, shifts worked, and pay amounts, tracking each shift down to the minute. (Pl.'s SOF ¶ 44-46, 49; Defs.' SOF ¶ 44-46, 49). Micros calculates pay for hourly employees by multiplying hours worked by the pay rates stored in the system. (Pl.'s SOF ¶ 55; Defs.' SOF ¶ 55).

### C. Minimum wage and tipping policies

#### 1. "Tip credit" against minimum wage

Osaka "claimed a tip credit[4] against [its] minimum wage obligations to hourly employees." (Pl.'s SOF ¶ 78; Defs.' Resp. to Requests for Admissions ¶ 14, Ex. C to Pl.'s Mot. for Summ. J. ECF 29-7). Plaintiff presents numerous affidavits from former Osaka employees attesting that they were not informed of the following: "that they were claiming a tip credit as part of their wages"; "that tipped employees had to be paid at least $2.13 per hour, in addition to any tips received"; "that Defendants could not claim more than $5.12 per hour as a tip credit as part of their wages"; "that the tip credit Defendants claimed could not exceed the tips tipped employees actually received"; "that Defendants could not take their tips unless they were part of a valid tip pool"; "that Defendant [sic] cannot claim a tip credit unless they inform tipped

---

[3] Pay rates for hosts and hostesses are disputed. While Plaintiff asserts that hosts/hostesses were paid $5.00-$7.00 per hour, Defendants assert that these employees were paid $7.00-$15.00 per hour. (Pl.'s ¶ SOF 36; Defs.' SOF ¶ 36).
[4] Neither party defines the term "tip credit," and this term is not actually defined in the FLSA. From context, it is clear Defendants intended to pay a wage less than the minimum wage of $7.25 per hour and make up difference through tips received, as is permitted under certain circumstances by Section 3(m) of the FLSA, 29 U.S.C. § 203(m).

employees about the tip credit." (Pl.'s SOF ¶¶ 81-86). Defendants dispute these assertions by citing to a portion of James' testimony in which he testified that he told new employees being hired at $2.83 per hour that they would be receiving tips. (Defs.' SOF ¶¶ 81-86). At his deposition, James testified that he "still [did]n't know" what the term "tip credit" meant. (JK Dep. 150:21).

### 2. Tip pool

At Osaka Chestnut Hill and Osaka Lansdale, servers and bartenders were required to contribute their tips to a tip pool, which was then distributed among various categories of employees. (KBK Dep. 91:25-93:2; JK Dep. 166:22-168:24). Prior to a federal investigation, the tip pools at the two locations included kitchen chefs, who did typically receive tips directly from customers and did not regularly interact with customers. (Pl.'s SOF ¶ 97; Defs.' SOF ¶ 97). Once the tips were pooled, the tip money received each shift would be distributed according to a points-based system according to which employees were assigned a particular point value based on their position, length of employment, and performance; servers, for example, received 50-100 points in the tip pool, and bartenders received 90-100 points in the tip pool. (Pl.'s SOF ¶ 101-02; Defs.' SOF ¶ 101-02). An employee would calculate tips by aggregating cash and credit card tips, and then distributing the tips based on the number of points each employee was allotted. (Pl.'s SOF ¶ 105; Defs.' SOF ¶ 105).

Although Kwang testified that he did not develop the points system, he testified that servers, bartenders, and hosts could not keep their own tips and were "required" to share them. (KBK Dep. 91:25-92:20). James testified that although no employee had ever been fired for failing to participate in a tip pool, he "[could]n't envision" a server staying on if he refused to participate in the tip pool.

Heng Kim, a former hibachi chef, wrote in his declaration that James and Kwang held a meeting with staff and "told the staff that we were required to pool our tips."[5] (Heng Kim Decl. ¶ 21, Ex. N. to Pl.'s Mot. for Summ. J., ECF 29-18). Former server Helen Prentice wrote in her declaration that she and a co-worker approached James to ask whether the tip pool would be changed, and James made clear that it would not. (Prentice Decl. ¶ 33, Ex. L. to Pl.'s Mot. for Summ. J., ECF 29-16).

### 3. Credit card deduction

It is undisputed that although credit card processing fees were 4%, Defendants deducted 15% from employees' credit card tips until this policy was changed in February 2016. (Pl.'s SOF ¶ 113-14; Defs.' SOF ¶ 113-14). Kwang testified that the extra eleven percentage points "was considered to cover [employees'] meals." (Defs.' SOF ¶ 113-14). Defendants did not reimburse their employees for the credit card tip deductions, and deposited the deductions into corporate bank accounts. (Pl.'s SOF ¶ 118; Defs.' SOF ¶ 118).

### D. Overtime policies

Hourly tipped employees were paid by multiplying their hourly rate by the number of hours worked (as logged in Micros); if Micros showed an hourly employee working more than 40 hours, Defendants did not pay overtime, but instead simply multiplied the number of hours

---

[5] Defendants asserted in their briefing that it is improper to rely on the "self-serving" declarations of former employees in deciding this summary judgment motion. At the telephone conference held on July 10, 2018, defense counsel stated that it was appropriate to consider the declarations, but that the declarations created genuine issues of material fact that rendered summary judgment improper. As the Court stated on the record, it is perfectly appropriate to consider affidavits at the summary judgment stage, and courts regularly evaluate employee affidavits when determining liability under the FLSA. See, e.g., Lawrence v. City of Philadelphia, 527 F.3d 299, 307 (3d Cir. 2008) (discussing affidavits of plaintiff employees and granting defendant's motion for summary judgment); Solis v. A-1 Mortg. Corp., 934 F. Supp. 2d 778, 790 (W.D. Pa. 2013) (discussing employee affidavits and granting the Secretary of Labor's motion for summary judgment).

worked by the employee's regular hourly rate. (Pl.'s SOF ¶ 55-56; Defs.' SOF ¶ 55-56). Plaintiffs provide Micros printouts for several hourly employees whose Micros printouts show more than 40 hours per week clocked in for the week of October 19-25, 2015, and who were not paid overtime, but Defendants assert that employees frequently forgot to clock out between the lunch and dinner shifts; thus, Micros would show employees as working when the restaurant was closed. (Pl.'s SOF ¶ 57-59; Defs.' SOF ¶ 57-59). Defendants would record the pay for the hourly tipped employees as recorded in the Micros printouts into a spreadsheet. (Pl.'s SOF ¶ 60; Defs.' SOF ¶ 60).

Daily-rate employees were paid by multiplying the number of days worked by the according to the number of days they had worked. (Pl.'s SOF ¶ 63; Defs.' SOF ¶ 63). Defendants did not pay daily-rate employees overtime, even if Micros had logged them as working more than 40 hours in a single week, and, as with the hourly employees, Defendants argue that daily-rate employees often did not clock out. (Pl.'s SOF ¶ 128-32; Defs.' SOF ¶ 128-32).

### E. Record-keeping practices

Osaka does not keep or maintain full records of employees' phone numbers and home addresses, or, in some cases, their full names. (Pl.'s SOF ¶ 148-49; Defs.' SOF ¶ 148-49). Kwang testified that he would make Excel spreadsheets showing monthly pay and then discard these after one to two months. (KBK Dep. 78:19-20). James testified that he would discard hard-copy Micros records a few weeks after employees were paid, and time records would be erased from the Micros server if the system crashed. (JK Dep. 115:12-116:15). James also testified that the pieces of paper on which employees calculated nightly tips after those tips were recorded. (Id. 176:1-16). Kwang testified that although Osaka has provided some information

regarding tips to Osaka's account to prepare tax returns since 2017, Osaka discards its handwritten records of tips received after one to two months because it "d[id]n't need them." (KBK Dep. 95:11-96:14).

### F. Understanding of FLSA obligations

Kwang testified that prior to an investigation by the Department of Labor, he believed that the minimum wage for servers was $2.83 per hour, and only learned that the general minimum wage was $7.25 per hour in the course of this litigation. (KBK Dep. 80:8-82:2). He also testified that he only learned what overtime was after the investigation began, and previously did not know that he had to pay time-and-a-half for time worked over 40 hours in a workweek. (Id. 43:16-44:5).

James' testimony regarding his understanding of overtime requirements was unclear. While he stated at first that he had not "truly underst[ood]" what overtime meant until the Department of Labor investigator had explained it to him (JK Dep. 96:20-23), he later asserted that he had known that overtime meant time-and-half pay for time worked over forty hours before the investigation. (Id. 97:11-98:12). He did not recall raising any issue of potential overtime violations to his father prior to the investigation. (Id. 127:20-24).

Defendants did not seek a legal opinion regarding, or consult with state or federal agencies regarding, whether Osaka's tipping, overtime, and recordkeeping practices complied with the FLSA. (Id. 133:3-135:21; JK Dep. 214:15-216:3).

### G. Investigation

At some point, Osaka was the subject of a federal investigation by the Department of Labor, but the precise chronology is unclear from the record before this Court. This lawsuit followed.

### III.     Procedural History

Plaintiff R. Alexander Acosta, Secretary of Labor, United States Department of Labor filed this action pursuant to the Fair Labor Standards Act on March 8, 2017.  (Compl., ECF 1.) Defendants filed their Answer on May 12, 2017.  (Answer, ECF 12.)

After the conclusion of discovery, Plaintiff moved for partial summary judgment on February 28, 2018, reserving the issue of damages for trial.  (Pl.'s Mot. for Summ. J. ECF 29.)

Instead of filing a response in opposition, Defendants filed a "motion for settlement conference" on March 28, 2018.  (Mot. for Settlement Conf., ECF 32.)  Plaintiff filed a memorandum in opposition to the motion for settlement conference on March 30, 2018.  (Mot. for Settlement Conf., ECF 33.)  Plaintiff filed a motion to amend the exhibit listing employees of Osaka on May 1, 2018.  (Mot., ECF 35.)

Defendants filed a memorandum in opposition to the motion for partial summary judgment on May 4, 2018.  (Defs.' Opp. to Summ. J., ECF 36.)  Plaintiff filed his reply on May 29, 2019.  (Pl.'s Reply in Support of Summ. J, ECF 38.)

The Court held a recorded telephone conference regarding the motion for partial summary judgment on July 10, 2018.

### IV.     Legal Standard

Summary judgment is appropriate if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. Summary judgment is appropriate if the non-moving party fails to rebut the motion by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## V.    Discussion

The Fair Labor Standards Act (FLSA) was enacted "with the goal of 'protect[ing] all covered workers from substandard wages and oppressive working hours.'" Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 147 (2012). The FLSA "establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 69 (2013).

It is undisputed that Osaka Chestnut Hill and Osaka Lansdale were covered entities under the FLSA. (Pl.'s Mem. in Support of Mot. for Summ. J ("Pl.'s Br.") at 6-8, ECF 29-2; Defs.' Mem. in Opposition to Mot. for Summ. J. ("Defs.' Br.") at 3, ECF 36-1).

### A.  Minimum Wage Violations for Hourly Tipped Employees

Section 6 of the FLSA requires that all covered employees be paid $7.25 per hour. 29 U.S.C. § 206 (a). Section 3(m) contains additional provisions for tipped employees:

> **(2)(A)** In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

**(i)** the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and

**(ii)** an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in clause (i) and the wage in effect under section 206(a)(1) of this title.

**(B)** <u>An employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit</u>.

The additional amount on account of tips may not exceed the value of the tips actually received by an employee. <u>The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee</u>, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

29 U.S.C § 203(m) (emphases added). "Tipped employee" is defined "as any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t).

The Second Circuit described the so-called "tip credit" allowed by Section as "permit[ting] restaurant employers to pay tipped employees a lower minimum wage as long as the employees earn a certain amount in tips." <u>Shahriar v. Smith & Wollensky Rest. Grp., Inc.</u>, 659 F.3d 234, 239 (2d Cir. 2011). If employers pay less than the general minimum wage and claim a tip credit but do not abide by the terms of Section 3(m), they may not credit any tips toward their minimum wage obligation. <u>Reich v. Chez Robert, Inc.</u>, 28 F.3d 401, 403 (3d Cir. 1994) (holding that defendant was ineligible for tip credit and liable to employees for full minimum wage for hours worked where it did not inform them that a tip credit was being taken).

### 1. Failure to inform employees of the tip credit

Plaintiff first argues that Defendants were ineligible to take the tip credit toward their minimum wage obligation because they did not tell Osaka employees that a tip credit was being taken. As the Third Circuit has interpreted the FLSA, "Section 3(m) … allows an employer to reduce a tipped employee's wage below the statutory minimum by an amount to be made up in tips, but only if the employer informs the tipped employee that her wage is being decreased under section 3(m)'s tip-credit provision." Chez Robert, Inc., 28 F.3d at 403 (emphasis added). If an employer "cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken and the employer is liable for the full minimum-wage." Id.

Plaintiff cites to deposition testimony in which both Kwang and James admitted to not telling employees about the tip credit. (KBK Dep. 80:13-84:7, 130:12-131:1; JK Dep. 148:18-24). Defendants argue that summary judgment is inappropriate because "employees are informed of their rate of pay including tips." (Defs.' Br. at 6). Defendants further assert in their response to Plaintiff's statement of material facts that "employees knew about the tip credit," see Defs.' SOF ¶ 80, but this is not supported by the deposition testimony Defendants cite:

> Q. Prior to the investigation, you only told them their hourly wage?
> A. Correct.
> Q. Did you say anything about tips?
> A. Yes. I mean, they would receive tips, yes.
> Q. What would you say about tips?
> A. You know, oddly enough, I mean, I would just tell them they would receive tips, but not too many people ever really asked how much or you know, they don't even -- most people don't even know what a tip pool is. So, we don't get to that discussion.

(JK Dep. 148:12-24). Defendants continued to assert at the telephone conference held on July 10, 2018 that informing employees of their pay rate and receipt of some tips was legally sufficient.

Defendants thus miss the crucial distinction between informing employees that they would making at least some money in tips, which Defendants appear to have done, and informing employees, as <u>Chez Robert</u> put it, that wages are "being decreased under section 3(m)'s tip-credit provision." 28 F.3d at 403. It is undisputed that that did not occur, and Plaintiff is entitled to summary judgment on this ground. Defendants were not entitled to take a tip credit during the relevant time period. Because Plaintiff has not moved for summary judgment on damages, the amount of liability will be determined at trial.

### 2. Requirement to participate in the tip pool

Plaintiff's second theory for ineligibility for the tip credit is that its tip pool failed to satisfy Section 3(m) of the FLSA. Plaintiff asserts that tipped employees, whose hourly rate was less than the general minimum wage of $7.25 per hour, were required to participate in tip pools that included non-tipped employees, in violation of Section 3(m). James admitted that bartenders and servers were required to participate in the tip pools, and to share their tips with other categories of employees. (JK Dep. 167:18-168:12). James subsequently clarified that kitchen chefs were included in the tip pool, and had been since "before [he] got there." (<u>Id.</u> 169:12). James also testified that Osaka Wayne, which had closed some fifteen years before, had employed the same point-based tip pool system. (<u>Id.</u> 218:6).

Heng Kim, a former hibachi chef, wrote in his declaration that James and Kwang held a meeting with staff and "told the staff that we were required to pool our tips."[6] (Heng Kim Decl. ¶ 21). Former server Helen Prentice wrote in her declaration that she and a co-worker approached James to ask whether the tip pool would be changed, and James made clear that it would not. (Prentice Decl. ¶ 33).

Defendants characterize the points-based system as voluntary "tip-sharing." Defendants cite to deposition testimony in which Kwang stated that he "[did]n't get involved in the tips— rather, the employees "have [a] system for themselves, [a] point system"—and denied coming up with the point system for tip sharing. (KBK Dep. 81:18; 84:3-4). Read in context, and in the light most favorable to Defendants, this deposition testimony simply establishes that former employees at Osaka Wayne, who later worked at the Chestnut Hill and Lansdale locations, initially established the point system and brought it to other restaurants, and that Osaka employees have some autonomy over the administration of the tip pool, particularly with regard to the amount of points a particular employee possessed. (See id. 113:2-114:7). Kwang himself admitted that kitchen chefs were included in the tip pool. (Id. 115:13-16). There is therefore no genuine issue of material fact that the tip pools were mandatory and included kitchen chefs.

The Third Circuit has not yet addressed whether mandatory tip pools that include employees (such as the kitchen chefs here) who do not regularly interact with and receive tips directly from customers are ineligible for the tip credit. Two other Circuits, in published

---

[6] Defendants assert that it is improper to rely on the "self-serving" declarations of former employees in deciding this summary judgment motion. However, it is perfectly appropriate to do so, and courts regularly evaluate employee affidavits when determining liability under the FLSA. See, e.g., Lawrence v. City of Philadelphia, 527 F.3d 299, 307 (3d Cir. 2008) (discussing affidavits of plaintiff employees and granting defendant's motion for summary judgment); A-1 Mortg. Corp., 934 F. Supp. 2d at 790 (discussing employee affidavits and granting the Secretary of Labor's motion for summary judgment).

opinions dealing with similar tip-pooling between front-of-the-house and back-of-the-house employees, have construed Section 3(m) to prohibit employers from claiming the tip credit where those employers required tip pooling with employees who do not interact with customers. See Shahriar, 659 F.3d at 240 (construing language of 3(m) and stating that "an employer loses its entitlement to the tip credit where it requires tipped employees to share tips with (1) employees who do not provide direct customer service or (2) managers"); Myers v. Copper Cellar Corp., 192 F.3d 546, 550 (6th Cir. 1999) (salad preparers who "abstained from any direct intercourse with diners, worked entirely outside the view of restaurant patrons, and solely performed duties traditionally classified as food preparation or kitchen support work... could not be validly categorized as 'tipped employees,'" making the tip pool that included them "illegal"); see also Roussell v. Brinker Int'l, Inc., 441 F. App'x 222, 231 (5th Cir. 2011) ("[t]he FLSA does not specify which employees may share in a tip pool; it merely authorizes tip-pooling 'among employees who customarily and regularly receive tips.'... Customarily, front-of-the-house staff like servers and bartenders receive tips. Back-of-the-house staff like cooks and dishwashers do not, and thus cannot participate in a mandatory tip pool").

As these cases held, the text of Section 3(m) is best read as prohibiting mandatory tip pools that include employees who do not typically receive tips directly from customers. Section 3(m) allows the tip credit only when "all tips received by such employee have been retained by the employee," although the statute stipulates that it "shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."  29 U.S.C. § 203(m)(2)(B).  Thus, the statutory text requires that employees must be allowed to keep the tips that they earn, with the exception that employees who customarily and regularly receive tips are allowed to pool their tips with other such employees.  The statute therefore does not allow

employers to force tipped employees to redistribute their tips to employees who do not receive tips (and who are therefore required to be paid the full minimum wage). This is confirmed by Department of Labor (DOL) regulations at 29 C.F.R. § 531.54, which state that "valid mandatory tip pools… can only include those employees who customarily and regularly receive tips." The tip pool at Osaka was therefore invalid. Because the tip pool at Osaka did not comply with Section 3(m) and DOL regulations, Defendants are not eligible for the tip credit.

### 3. Unlawful 15% deduction from credit card tips

Plaintiff's last theory of tipping violations is Osaka's treatment of credit card tips. It is undisputed that, during the relevant period, Osaka's credit card processing fees were 4%, but Defendants deducted 15% of credit card tips. (Defs.' SOF ¶ 113, 114). Plaintiff asserts that under DOL guidance and case law from other circuits, "employers may deduct from employees' tips to recoup only the amount the credit card servicer charges for processing the payment." (Pl.'s Br. at 14). Relying on <u>Myers v. Copper Cellar Corp.</u>, 192 F.3d 546 (6th Cir. 1999), on which Plaintiff also relies, Defendants assert that this practice was "not to enrich the Defendants" because Kwang testified that it was intended to cover the cost of employee meals at the restaurant, and the "fee" was therefore "valid." (Defs.' Br. at 6). However, as Plaintiff notes in his reply brief, there is no testimony whatsoever of what these meals cost or who participated in them; moreover, Defendants cite no cases in which a court held that it was legal under the FLSA for an employer to deduct credit card tips in excess of the processing fee to pay for meals.

### a. Relevant authorities

In the absence of Third Circuit precedent, agency guidance decisions from other federal appellate courts guide this Court's analysis.

**Myers v. Copper Cellar Corp., 192 F.3d 546 (6th Cir. 1999)**

In Myers, a group of restaurant employees challenged the defendant restaurants' practice of "habitually" deducting 3% of tips paid by credit card or "similar instrument" as a violation of Section 3(m). 192 F.3d 646, 552 (6th Cir. 1999). The 3% deduction remained constant throughout the period at issue, even though the average credit card processing fees had declined from 4% at the beginning of the relevant period to 2% at the time of the bench trial in the court below. Id. at 553. The Sixth Circuit affirmed the judgment of the district court in favor of the defendant, holding that an employer may

> withhold a standard composite percentage from each credit card tip, even if, as a consequence, some deductions will exceed the expense actually incurred in collecting the subject gratuity, as long as the employer proves by a preponderance of evidence that, in the aggregate, the amounts collected from its employees, over a definable time period, have reasonably reimbursed it for no more than its total expenditures associated with credit card tip collections. Stated differently, the employer must prove that its total deductions from employees' tip incomes did not enrich it, but instead, at most, merely restored it to the approximate financial posture it would have occupied if it had not undertaken to collect credit card tips for its employees during the relevant period.

Myers, 192 F.3d at 554–55.

**Department of Labor Guidance**

The Department of Labor (DOL) Field Operations Handbook allows employers to deduct credit card tips in the following circumstances:

> When tips are charged to credit cards, the employer may reduce the amount of tips paid to the employee by the percentage charged by the credit card company (i.e., transactional fee). However, the employer cannot reduce the amount of tips paid to the employee by any amount greater than the transactional fee. For example, where a credit card company charges an employer 3 percent on all sales charged to its credit service, the employer may pay the employee 97 percent of the tips without violating FLSA.

DOL Field Operations Handbook § 30d05(a).[7]

**Steele v. Leasing Enterprises, Ltd., 826 F.3d 237 (5th Cir. 2016)**

In Steele, a class of restaurant servers sued a restaurant chain, which withheld 3.25% of credit card tips to offset "credit card issuer fees and other costs," such as hiring armored vans to deliver cash, "incurred in collecting and distributing the tips." Steele v. Leasing Enterprises, Ltd., 826 F.3d 237, 241 (5th Cir. 2016). Following a bench trial, the district court found this practice violated Section 3(m) of the FLSA because the amount deducted exceeded the credit card issuer fees. Id.

The Fifth Circuit affirmed. The court specifically rejected the defendant's argument that "an employer may also deduct an average of additional expenditures associated with credit card tips and still maintain a tip credit under § 203(m)." Id. at 244. Relying on Myers and the DOL guidance, the court held that the defendant made two "business decisions" that "were not required to collect credit card tips": paying out tips in cash each night and choosing to get cash delivered three times a week for security reasons; in several years, the court noted, the total amount deducted exceeded the total costs of credit card issuer fees and cash delivery costs. Id. at 245. The court therefore held:

> Allowing [the defendant] to offset employees' tips to cover discretionary costs of cash delivery would conflict with § 203(m)'s requirement that "all tips received by such employee have been retained by the employee" for employers to maintain a statutory tip credit. [The defendant] has not pointed to any additional expenses that are the direct and unavoidable consequence of accepting credit card tips. Because [the defendant's] offset *always* exceeded the direct costs required to

[7] Available online at https://www.dol.gov/whd/FOH/FOH_Ch30.pdf, at 35. The Field Operations Handbook, citing a post-Myers opinion letter, also clarifies that "[c]osts incurred by the employer related to credit card use, other than the fee charged by a credit card company for processing, may not be used to reduce the amount of the tips the employer must distribute to the tipped employee…"[a]ny employer attempt to deduct an average standard composite amount for tip liquidation that exceeds the amount charged by the credit card companies is not acceptable." Id. § 30d05(e).

> convert credit card tips to cash, as contemplated in § 203(m) and interpreted by the Sixth Circuit, we hold that [the defendant's] 3.25% offset violated § 203(m) of the FLSA.

Id. at 246.

### b. Application

Myers, Steele, and the DOL guidance do not address the situation in this case in which the excess deduction from credit card tips was ostensibly for paying for employee meals, a cost entirely unrelated to converting credit card fees to cash—and nearly triple the amount of the credit card processing fee. Defendants quote Myers out of context for their assertion that the 11-percentage-point deduction did not "enrich" it by virtue of the tips' paying for meals; Myers actually required employers to prove that credit card tip deductions "at most, merely restored it to the approximate financial posture it would have occupied if it had not undertaken to collect credit card tips for its employees." 192 F.3d at 555. This is not the case here, where Defendants did enrich themselves relative to what their financial position would have been had they not taken employees' tips, for example, by passing the cost along to customers in the form of higher prices.

Defendants' assessment of how staff meals should be paid for is no substitute for compliance with the FLSA. Section 3(m)(2)(B) states that "[a]n employer may not keep tips received by its employees for any purposes… regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B). Although some cases in other Circuits and DOL guidance approve of the practice of requiring tipped employees to reimburse employers for credit card processing fees, the practice of deducting 11 percentage points of employees' tips in excess of credit card processing fees and depositing the funds in corporate bank accounts clearly

violates Section 3(m) of the FLSA, making Defendants ineligible for the tip credit during the relevant time period, and liable for the 11 percentage points' worth of tips taken.

## B. FLSA Overtime Violations

Section 7 of the FLSA requires employers to pay employees "at least one and one-half times the regular rate" for time worked in excess of forty hours in a "workweek." 29 U.S.C. § 207(a)(1). Both Kwang and James testified at their depositions that they did not pay either hourly or daily-rate employees overtime, but Defendants have produced what appears to be a Micros printout showing both regular pay and a category for "Ovt," which presumably refers to overtime. (JK Dep. 103:4-17; KBK Dep. 68:19-21; Defs.' SOF ¶ 124).

Defendants concede that "there are some instances within the 'relevant time period' that their employees were not paid overtime…However, it is factually inaccurate to argue that all individuals were not paid overtime." (Defs.' Br. at 7). This is Defendants' entire argument on the overtime issue.

Because Plaintiff has not moved for summary judgment on the issue of damages—and particularly because whether employees incorrectly failed to clock out on Micros between the lunch and dinner shifts is disputed—the extent of Defendants' overtime violations will be determined at trial.

## C. FLSA Recordkeeping Violations

Section 11(c) of the FLSA "requires employers to maintain accurate records to ensure that all workers are paid the minimum wage for every hour worked. <u>Williams v. Tri-City Growers, Inc.</u>, 747 F.2d 121, 128 (3d Cir. 1984). Department of Labor regulations require employer payroll records to include the following pieces of information for their employees: full name, home address, date of birth, sex, occupation, time and day of the start of their workweek,

regularly hourly rate of pay, hours worked each day and each workweek, total weekly straight-time earnings, total weekly overtime premium pay, total additions to or deductions from wages, total wages paid per pay period, and date of payment and period covered by payment. 29 C.F.R. § 516.2(a). All payroll records are to be preserved for at least three years. 29 C.F.R. § 516.5(a).

Although Defendants describe Micros printouts in their response to Plaintiff's statement of undisputed facts as "payroll records," <u>see</u> Defs.' SOF ¶ 141, there is no genuine issue of material fact as to whether Defendants were out of compliance with the statutory and regulatory recordkeeping requirements. Defendants point to testimony that some records entered into Micros were saved in the system between system crashes, and Kwang testified that he "[thought] the assistant manager has telephone numbers of all the employees." (Defs.' SOF ¶ 140, 148). However, Defendants have presented no evidence that they actually gathered the information required by the regulations, much less maintained it for three years. The Excel spreadsheets and Micros records do not contain this information, and both Kwang and James testified that they would discard what records they had. (KBK Dep. 78:19-20; 95:11-96:14; JK Dep. 115:12-116:15; 176:1-16).[8]

---

[8] Misperceiving Plaintiff's argument, Defendants assert that "Plaintiff appears to argue that a violation of Section 11(c) leads to separate liability." (Defs.' Br. at 8). However, Plaintiff had simply explained that the lack of employment records is neither a defense to employer liability, nor an impediment to receiving back wages owed, and had explained how the Court was to proceed when determining damages at trial. (<u>See</u> Pl.'s Br. at 23-24). The Third Circuit has held that "[i]n the absence of adequate employer records … the solution is not to penalize the employees by denying recovery based on an inability to prove the extent of undercompensated work, but rather to allow the employee or the Secretary to submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred." <u>Martin v. Selker Bros.</u>, 949 F.2d 1286, 1297 (3d Cir. 1991).

Thus, no genuine issue of material fact exists as to whether Defendants were in compliance with the recordkeeping requirements of the FLSA and its regulations, and Plaintiff is entitled to summary judgment on this issue.

### D. Willfulness

#### 1. Legal Standard

In general, FLSA actions must be "commenced within two years after the cause of action accrued…except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). Thus, "whether an employer 'willfully' violates the statute is of import because such a finding extends the FLSA's limitations period from two years to three, bringing another year of lost pay within the scope of the worker's claim." Souryavong v. Lackawanna Cty., 872 F.3d 122, 126 (3d Cir. 2017).

McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988), which concerned alleged overtime violations by shoe manufacturers, established that for a court to deem an FLSA violation "willful," the employer must have "either kn[own] or show[n] reckless disregard for the matter of whether its conduct was prohibited by the statute." Id. at 133 (remanding to Court of Appeals for application of this standard). Finding it "obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations," the Court rejected a proposed standard that would have required a showing only "that an employer knew that the FLSA 'was in the picture,'" which, the Supreme Court opined, would make it "virtually impossible for an employer to show that he was unaware of the Act and its potential applicability" and make the two-year statute of limitations "seem to apply only to ignorant employers." Id. at 132, 132, 133. The Court added in a footnote that "[i]f an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful…[i]f an

employer acts unreasonably, but not recklessly, in determining its legal obligation" it would not be considered to have acted willfully under the standard it announced.  Id. at 135 n.13.

McLaughlin's test of an employer's knowledge or reckless disregard for whether it was violating the FLSA remains the law in this Circuit.  See, e.g., Souryavong, 872 F.3d at 126 (affirming judgment as a matter of law for defendant that FLSA violations were not willful where defense witness "only testified to an awareness of the FLSA on a basic level" and holding that "[w]illful FLSA violations require a more specific awareness of the legal issue").

Third Circuit cases have differed on whether willfulness is a question of law or fact, with recent cases tending to describe the issue as one of fact.  Compare id.; Pignataro v. Port Auth. of New York & New Jersey, 593 F.3d 265, 273 (3d Cir. 2010) (willfulness is a question of fact) with Martin v. Selker Bros., 949 F.2d 1286, 1292 (3d Cir. 1991) (willfulness is a question of law).

### 2. Application

By moving for summary judgment on the issue of willfulness, Plaintiff implicitly argues that no reasonable jury could conclude that Defendants had not acted willfully.  Such a conclusion simply cannot be drawn from the record currently before the Court.  This Court is especially wary of granting Plaintiff's motion for summary judgment given the paucity of binding Third Circuit precedent in which a court granted a plaintiff's motion for summary judgment on the issue of willfulness in an FLSA case.  See Souryavong, 872 F.3d at 126 (affirming judgment as a matter of law for defendant); Pignataro, 593 F.3d 265 (affirming district court's finding at summary judgment that employer had not acted willfully); Reich v. Gateway Press, Inc., 13 F.3d 685, 703 (3d Cir. 1994) (affirming district court's finding after bench trial

that employer had not acted willfully); Selker Bros., 949 F.2d at 1296 (affirming district court's conclusion after trial that employer had acted willfully).

Plaintiff makes three arguments in favor of willfulness: James testified to knowing, prior to the federal investigation, that employees who work over forty hours are entitled to overtime pay; that Defendants continued violating minimum wage and overtime provisions after the federal investigation; and that its practice of discarding records "corroborate[d] willfulness." (Pl.'s Br. at 26). Defendants respond that Plaintiff has not met his burden on summary judgment, particularly where no prior federal enforcement actions had taken place, and no employees complained of the alleged violations. (Defs.' Br. at 9-10).[9]

Plaintiff overstates his case that James' testimony established that Defendants acted willfully in failing to pay employees overtime. James actually gave contradictory testimony at his deposition regarding his knowledge of overtime requirements. Initially he testified that he had not "truly underst[ood]" what overtime meant until the Department of Labor investigator had explained it to him (JK Dep. 96:20-23), but later stated that he had known that overtime meant time-and-half pay for time worked over forty hours before the investigation. (Id. 97:11-98:12). Later, James described interactions with his father:

> Q. Did your father ever say anything to you about paying hourly employees overtime?

---

[9] At the telephone conference, the parties presented new arguments supporting their respective positions. Plaintiff argued, without any specific citation to authority, that Defendants' failure to pay minimum wage and overtime were "obvious" violations of the FLSA, making their conduct willful. Defendants stressed that they lacked "actual knowledge" of the requirements of the FLSA.

Defendants also argue that under Rule 407 of the Federal Rules of Evidence, the Court should not consider the steps Defendants took to come into compliance after the investigation; however, this does not address Plaintiff's argument that Defendants continued to be out of compliance with the FLSA after the investigation. (See Defs.' Br. at 11).

A. He's -- I don't think he thought there was any overtime in the restaurant business. And I think I've had that conversation with him. There is no overtime, just pay them this, but then, like –

Q. What does that mean about -- what does that mean?

A. Have we ever had a conversation about this? Yes, but he would say just pay her that.

Q. When did that conversation take place?

A. I don't know. I mean, just for years. So, I don't remember. It's been a long time ago, yes.

Q. Did you ever raise any concern to him about employees not getting paid overtime?

A. Before they -- before this, I don't recall to be honest. I don't think -- no one has really ever come up to anybody and said I should be getting paid overtime. So, I don't think it was ever addressed.

(JK Dep. 127:4-24).

In light of Kwang's repeated testimony that he didn't know about the legal requirements for minimum wage and overtime (KBK Dep. 43:16-17; 81:25-82:6; 87:15-16; 152:11) and his testimony that James—whom he later fired—had "no power," (id. 138:14), a reasonable jury could find that these violations were not willful, particularly prior to the federal investigation. Kwang, an immigrant who did not speak English—and who told Plaintiff's counsel at deposition that he "still ha[d] questions" about compliance with minimum wage laws, and asked Plaintiff's counsel what the minimum wage was for servers—appears simply to have been ignorant of the requirements of the law, and a strong-willed businessman all too willing to dismiss his son's concerns. (See id. 129:7-9). At the summary judgment stage, these facts do not support a finding that Defendants acted with actual knowledge or reckless disregard for the unlawfulness of their conduct. To the contrary, it appears that Kwang was a not especially sophisticated small business owner—just the sort of "ignorant" employer who, under McLaughlin, did not act willfully.

Plaintiff next argues that Osaka's alleged ongoing FLSA violations at the time depositions were taken in November 2017—evidently after the conclusion of the wage and hour

investigation, the chronology of which is not at all clear—demonstrates that Defendants' alleged

FLSA violations were willful. While such evidence might demonstrate the willfulness of any

violations subsequent to the investigation, it is not necessarily probative of prior willfulness. The

statute simply gives plaintiffs an additional year to sue, and violations from November 2017

would not yet be time-barred.[10]

Finally, Plaintiff argues that Defendants' poor recordkeeping practices "corroborate

willfulness"—in essence, that Defendants willfully violated core provisions of the FLSA,

including its recordkeeping requirements, and covered their tracks by discarding records. The

record suggests that Defendants were as ignorant about the recordkeeping requirements as they

were about the minimum wage and overtime requirements, and discarded records simply because

they thought they "d[id]n't need to keep them." (KBK Dep. 76:10).

Thus, the Court denies Plaintiff's motion for summary judgment on the issue of

willfulness.

### E. Liquidated Damages

FLSA Section 16(b) states that "[a]ny employer who violates the provisions of section

206 or section 207 of this title shall be liable to the employee or employees affected in the

---

[10] The parties further dispute the relevant time period for which damages are sought in this lawsuit, which was filed on March 8, 2017. Defendants, who take the position that any FLSA violations were not willful, argued at the telephone conference that damages were available only for the two years preceding the lawsuit. Plaintiff defines the term "relevant time period" in his briefing to refer to "September 1, 2013, through at least August 31, 2016," see Pl.'s Br. at 1, and requested damages for ongoing violations subsequent to August 31, 2016 in his Complaint. At the telephone conference, Plaintiff represented that he considered the relevant time period to extend from September 1, 2013 to the present, in part pursuant to a "tolling agreement" that does not appear to be in the record. September 1, 2013 is more than three years prior to the filing of the lawsuit on March 8, 2017, and would be appear to be time-barred even under a three-year statute of limitations for willful FLSA violations, absent some sort of tolling. The time period for which damages are recoverable will need further explanation and record development by the parties at a later stage in this lawsuit when they address damages directly.

amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  Section 16(c) allows the Secretary of Labor to bring an action "to recover the amount of unpaid minimum wages or overtime compensation and an equal amount as liquidated damages."  Id. § 216(c).  However, Section 60 of the FLSA allows a court not to award the full amount of liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act."  29 U.S.C. § 260.

The Third Circuit has described liquidated damages under Section 16(b) as "mandatory." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 907 (3d Cir. 1991).  Employers "bear[] the 'plain and substantial' burden of proving" that they are entitled to discretionary relief from a full award of liquidated damages.  Id.  To do so, employers must show "good faith and reasonable grounds" for their actions, which is a two-part inquiry:

> The good faith requirement is a subjective one that "requires that the employer have an honest intention to ascertain and follow the dictates of the Act." ... The reasonableness requirement imposes an objective standard by which to judge the employer's conduct ... Ignorance alone will not exonerate the employer under the objective reasonableness test....
>
> If the employer fails to come forward with plain and substantial evidence to satisfy the good faith and reasonableness requirements, the district court is without discretion to deny liquidated damages.

Id. at 907–08 (emphasis added) (quoting Williams v. Tri-Cty. Growers, Inc., 747 F.2d 121, 129 (3d Cir. 1984)) (holding that a "failure" "to take affirmative steps to ascertain the Act's requirements" prior to a federal wage and hour investigation "preclude[d] a finding of reasonable good faith"); see also Sec'y United States Dep't of Labor v. Am. Future Sys., Inc., 873 F.3d 420,

433 (3d Cir. 2017) (holding that a defendant's "insufficient efforts to investigate and comply with the FLSA" did not meet the required burden).

Plaintiff argues that Defendants have not met their evidentiary burden, and that the record shows that Defendants did nothing to ascertain what was required of them under the FLSA. (Pl.'s Br. at 27-29). Defendants, relying on case law from other Circuits, respond that this Court should deny liquidated damages because Defendants did not act willfully. (Defs.' Br. at 12).

Whether or not this is the standard in other Circuits, the Third Circuit has held for over thirty years that employees or the Secretary of Labor "need not establish an intentional violation of the Act to recover liquidated damages." Williams, 747 F.2d at 129. Rather, the employer (not the employee or the Secretary) must "affirmatively establish" its reasonable good faith. Id.

In this case, both Kwang and James admitted in their depositions that they had made no effort to consult with either an attorney or state or federal authorities about whether their tipping, overtime, and recordkeeping practices complied with the Fair Labor Standards Act. (KBK Dep. 133:3-135:21; JK Dep. 214:15-216:3). Thus, there is no genuine issue of material fact that Defendants failed, as Cooper Electric put it, "to take affirmative steps to ascertain the…requirements" of the FLSA, "preclud[ing]" a finding of reasonable good faith. See 940 F.2d at 908. Plaintiff is therefore entitled to summary judgment on the issue of liquidated damages, the precise amount of which remains to be determined.

### F. Individual Liability as Employers of Kwang Bum Kim and James Kim

#### 1. Standard

Plaintiff next seeks to hold Kwang and James individually liable as joint employers for damages owed to Osaka employees. The FLSA "imposes individual liability on 'any person acting directly or indirectly in the interest of an employer in relation to an employee....' 29

U.S.C. § 203(d). Aside from the corporate entity itself, a company's owners, officers, or supervisory personnel may also constitute 'joint employers' for purposes of liability under the FLSA." Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 153 (3d Cir. 2014).

This Court applies the "economic reality test" for joint employment set forth in In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig., 683 F.3d 462 (3d Cir. 2012), to determine whether an owner, officer, or supervisory employee of a company is individually liable for violations of the FLSA.[11] Perez v. Am. Future Sys., Inc., No. CV 12-6171, 2015 WL 8973055, at *11 (E.D. Pa. Dec. 16, 2015), aff'd on other grounds sub nom. Sec'y United States Dep't of Labor v. Am. Future Sys., Inc., 873 F.3d 420 (3d Cir. 2017) (applying Enterprise and granting Secretary's motion for summary judgment that president and CEO of defendant corporation was individually liable as an employer). The Enterprise test requires courts to consider the following four factors:

> 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

683 F.3d at 469. However, Enterprise stressed that "these factors do not constitute an exhaustive list of all potentially relevant facts, and should not be blindly applied. ... A determination as to whether a defendant is a joint employer must be based on a consideration of the total employment situation and the economic realities of the work relationship." Id. (internal

---

[11] This Court discussed Enterprise in a somewhat different factual context in its recent opinion in Livers v. Nat'l Collegiate Athletic Ass'n, No. CV 17-4271, 2018 WL 2291027, at *10 (E.D. Pa. May 17, 2018).

quotations and citations omitted).  In so doing, district courts must consider "all the relevant evidence."  Id.

### 2. Kwang Bum Kim

Defendants do not contest that Kwang, the sole corporate officer of Osaka, is liable as an employer, and instead devote the entirety of this section—which cites no Third Circuit precedent—to contesting whether James is liable as an employer under the FLSA.  The Court considers Defendants to have conceded this issue, and therefore grants summary judgment for Plaintiff on the issue of Kwang's individual liability to Osaka employees as a joint employer.  See Acosta v. Cent. Laundry Inc., No. CV 15-1502, 2018 WL 1726613, at *2 (E.D. Pa. Apr. 10, 2018) (court had earlier granted summary judgment as to individual liability as employers for business owners where the defendants had not addressed the issue in the opposition to their motion to dismiss).

### 3. James Kim

Defendants argue, based on First Circuit precedent that did not employ the Enterprise criteria used in this Circuit, that James should not be classified as an employer under the FLSA. Plaintiff argues that the Enterprise factors establish that he is entitled to summary judgment on this issue.  The Court will apply the Enterprise factors.

#### a. Authority to hire and fire employees

The first Enterprise factor is the "authority to hire and fire employees."  683 F.3d at 469. James was clearly involved in hiring and firing employees to some degree.  Various employees testified that he communicated to them that they were hired or fired.  (Schnalke Dec. ¶ 31, Ex. K to Pl.'s Mot. for Summ. J.; Heng Kim Decl. ¶ 31).  However, when asked whether James hired employees at Osaka Lansdale, Kwang testified, "No. I'm the one who hires employees," and

denied that he relied on James' recommendations in hiring, stating that he met potential employees "personally, and then if I like the person…" (KBK Dep. 23:12, 24:10-11). When asked whether he had the ability to fire employees, James testified that he could not fire employees on his own, but would instead "relay the message[]" from his father to fire employees and then "have that conversation with the employee." (JK Dep. 62:11-63:6). James testified that he would sometimes hire employees for a "probationary" period subject to his father's approval. (Id. 59:20-60:8).

### b. Authority to promulgate work rules and assignments and set conditions of employment

The second Enterprise factor is the "authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment." 683 F.3d at 469. During his deposition, James referred to "Mr. Kim's rules," and repeatedly testified to "relaying messages" regarding those rules, such as not to chew gum. (JK Dep. 166:14; 24:23-25:10). James testified that he did not have the authority to set rates of pay. (Id. 63:23-64:1). Although he had sometimes set the schedule for restaurant employees, he described scheduling as "Mr. Kim says put this person on this day, take off these days." (Id. 64:17-18).

### c. Day-to-day supervision, including employee discipline

The third Enterprise factor is whether the alleged employer has "day-to-day supervision, including employee discipline." 683 F.3d at 469. Numerous Osaka employees submitted declarations testifying to James' day-to-day supervision of their work. (Pl.'s SOF ¶ 19). For example, former hostess and bartender Francesca Schnalke stated in her declaration that James "would instruct me to straighten up cushions, wipe down and replace menus, and water plants, and would tell me not to lean on tables or sit down during service." (Schnalke Dec. ¶ 32). Helen

Prentice stated in her declaration that James would "instruct us to clean up the restaurant…and tell us how to interact with customers." (Prentice Decl. ¶ 35, Ex. L to Pl.'s Mot. for Summ. J., ECF 29-16). James testified that his father would be watching the goings-on in the restaurants remotely via video feed, and would sometimes give orders to pass on, such as telling a hostess to stay "up front." (JK Dep. 67:5-11).

### d. Control of employee records

Finally, courts consider "control of employee records, including payroll, insurance, taxes, and the like." Enterprise, 683 F.3d at 469. Kwang testified that James had access to the restaurant safe, into which the employees dropped tip sheets each night. (KBK Dep. 110:1-7). James and could make deposits to and withdraw funds from the restaurants' corporate account. (JK Dep. 58:9-16; 71:11-24). James testified that he did the payroll at Osaka Lansdale and occasionally also at Osaka Chestnut Hill by printing out employee hours from Micros, which showed employee hours and pay rates, and then prepared paychecks. (Id. 69:5-71:10). He also testified that he communicated with Osaka's accountant regarding employee hours and pay. (Id. 86:23-84:2).

### e. Other relevant evidence

Plaintiff also points to evidence regarding James' involvement in the tip system at Osaka. Helen Prentice wrote in her declaration that she and a co-worker approached James to ask whether the tip pool would be changed, and James made clear that it would not. (Prentice Decl. ¶ 33). Prentice also stated that James would sometimes make her redo the tip pool calculation if he thought the calculation was incorrect. (Id. ¶ 32). Heng Kim wrote in his declaration that James and Kwang held a meeting with staff and "told the staff that we were required to pool our tips." (Heng Kim Decl. ¶ 21).

**f. Evaluation**

Plaintiff has moved for summary judgment on James' individual liability as an employer under the FLSA, thereby implying that there is no genuine issue of material fact on the issue of his status as a joint employer and that no reasonable jury could find that he was not a joint employer. Plaintiff is correct that that to establish individual liability as a joint employer under Enterprise, a plaintiff must exercise only "significant control" over employees, and "[u]ltimate control is not necessarily required." 683 F.3d at 468. See also Solis v. A-1 Mortg. Corp., 934 F. Supp. 2d 778 (W.D. Pa. 2013) (granting Secretary's motion for summary judgment as to the individual liability as to business owner's spouse who exercised significant control over employees under all four Enterprise factors).

Yet a reasonable jury could conceivably find that James' responsibilities at Osaka did not meet even that standard, and the evidence, viewed in the light most favorable to the Defendants, as is appropriate at the summary judgment stage, does not lead ineluctably to Plaintiff's desired result. Some of the Enterprise factors, such as James' day-to-day supervision of restaurant staff and doing payroll at Osaka Lansdale, point toward James' having been a joint employer of the Osaka employees. Others, such as his inability to hire and fire employees or to set workplace rules, suggest that he was not, and instead simply a mouthpiece for his father. Reasonable juries could evaluate this evidence, and the Enterprise factors, differently, and the ultimate resolution of James' individual liability will therefore be for the jury in this case.

**G. Injunctive Relief**

Finally, Plaintiff seeks injunctive relief to force Defendants to comply with the FLSA, which the Secretary of Labor may seek to prevent a defendant from "committing future

violations" of the FLSA.  Sec'y United States Dep't of Labor v. Am. Future Sys., Inc., 873 F.3d 420, 424 (3d Cir. 2017).

Whether to grant an injunction for an FLSA violation is "within the court's sound discretion."  Acosta v. Cent. Laundry Inc., No. CV 15-1502, 2018 WL 1726613, at *10 (E.D. Pa. Apr. 10, 2018) (quoting A-1 Mortg. Corp., 934 F. Supp. 2d at 815) (entering injunction for minimum wage and overtime violations after bench trial).  In deciding whether to grant an injunction, courts consider "(1) 'the employer's past conduct'; (2) the employer's 'current conduct'; and (3) 'most importantly, whether the employer can be counted on to comply with the FLSA in the future.'"  Id.

Plaintiff asserts that injunctive relief is warranted based on the "years" of FLSA minimum wage, overtime, and recordkeeping violations at Osaka, and "Defendants' failure to come into compliance after the Wage and Hour investigation," rendering any assurances of compliance by Defendants "hollow and meaningless."  (Pl.'s Br. at 36).  Kwang testified at his deposition that, even after the federal investigation, Osaka still did not inform servers of the tip credit, and was continuing to pay tipped employees below the minimum wage of $7.25 per hour because Osaka "couldn't stay in business" if it were to pay the full minimum wage.  (KBK Dep. 128:19-132:19).

Defendants, without citing to any case law, assert that "[w]hether issued under 29 U.S.C. § 217 or some other basis, an injunction is still equitable relief which can only be entered in accordance with Fed. R. Civ. P. 65."  (Defs.' Br. at 15).  Defendants thus obliquely point out a central failing of Plaintiff's request for injunctive relief: Plaintiff seeks prospective injunctive relief on the basis of the summary judgment record alone, without a hearing of any sort.  Plaintiff has cited no authority from this Court or the Third Circuit in which a court has done so.  At the

telephone conference, the parties cited two cases in which a court granted an injunction for FLSA violations at the summary judgment stage: <u>Perez v. D. Howes, LLC</u>, 790 F.3d 681 (6th Cir. 2015), a two-paragraph memorandum opinion affirming a lower court's grant of an injunction for violations of Michigan wage and hour laws, and <u>Solis v. A-1 Mortg. Corp.</u>, 934 F. Supp. 2d 778, 782 (W.D. Pa. 2013), which does not mention Rule 65, much less its application to FLSA cases.

The request for an injunction is therefore denied, without prejudice to the Court's entering an injunction at a later stage in the proceedings.

## VI.    Conclusion

For the reasons that follow, Plaintiff's motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART.**  An appropriate order follows.

O:\CIVIL 17\17-1018 Hugler v Osaka Japan\17cv1018 Osaka MSJ Memo.docx